Cross, Jr. and Ralph Cross, Sr., License No. 518; John Cross, Jr. and Jerry Ranville, License No. 602, Plaintiffs,

v.

**MICHIGAN DEPARTMENT OF NATURAL RESOURCES and David F. Hales, Director of the Michigan Department of Natural Resources, Defendants.**

**No. M87–272 CA3.**

United States District Court,
W.D. Michigan, S.D.

Dec. 13, 1989.

Clifford BIGELOW, License No. 401; Brown Fisheries, Inc., License No. 404; Casey Fisheries, Inc., License No. 405; Leonard Dutcher Fishery, Inc., License No. 408; Gerald L. Moore, Sr., License No. 412; Paul H. Brown, License No. 417; Cedarville Fish Company, License No. 420; Lamb Fishery, Inc., License No. 425; John Leclair, License No. 430; Roger Wollangur and Raymond Halberg, License No. 431; Robert Chartrand and Christine Chartrand, License No. 433; Harold W. Sellman, License No. 442; Melvin R. Sellman, License No. 443; Wayne Wachter and Mary Wachter, License No. 445; Shirley A. Wilcox, Jeffrey M. Wilcox, and Daniel J. Wilcox, License No. 447; Our Sons Fisheries, License No. 448; Frazier Fish Corporation, License No. 460; Baker Fishery, Inc., License No. 461; Clarence Brooks and Winifred Brooks, License No. 500; L & H Fishery, License No. 501; Donald R. Cole, License No. 503; Ralph Cross, Jr. and Ralph Cross, Sr., License No. 505; James Kenwabikise, Paul David Kenwabikise Estate, and Stephen Kenwabikise, License No. 516; Francis E. Martin and Jacqueline L. Martin, License No. 517; Ralph

Brown & Brown Law Offices by Charles M. Brown, St. Ignace, Mich., Rhoades, McKee, Boer, Goodrich & Titta by Dale W. Rhoades, Robert J. Dugan, Grand Rapids, Mich., for plaintiffs.

Frank J. Kelley, Atty. Gen. by Kevin T. Smith, Thomas J. Emery, Leo H. Friedman, Asst. Atty. Gen., Natural Resources & Military Affairs, Lansing, Mich., for defendants.

## OPINION

ENSLEN, District Judge.

Defendants, the Michigan Department of Natural Resources ("DNR") and David F. Hales, the Director of the DNR, have filed both a motion for summary judgment and a motion for partial dismissal in this case.

*Facts*

The plaintiffs are a group of commercial fishers whose state-issued commercial fishing licenses have been drastically impaired by reductions in the commercial harvest occasioned by the entry of a consent order in *United States v. State of Michigan*, No. M26–73. That case involved the treaty rights of several Indian tribes to fish in the Great Lakes. The original District Court case in *United States v. Michigan* resulted in a ruling that held that the tribes had unique, exclusive and off reservation rights to fish commercially in the ceded waters free from any regulation by the State of any limitation as to the time, place or manner of their fishing activities. 471 F.Supp. 192 (D.C.Mich.1979). The State of Michigan appealed the Court's holding. The Sixth Circuit in *United States v. Michigan*, 653 F.2d 277 (6th Cir.1981) held that the Treaty of 1836 guaranteed fishing rights to the Indians, including aboriginal rights to engage in gill net fishing. However, the Court ruled that the Indians' rights were not absolute and that they could be subject to the least restrictive state regulation necessary for the conservation of the fish and the fisheries in the Great Lakes. *Id.* at 278.

In the fall of 1983 three Tribes filed a motion to allocate the resource between themselves and the State. Subsequent to the Tribes' filing, various parties moved to intervene as party defendants including a large group of individually named state-licensed commercial fishers ("Ruleau petitioners"), the Michigan United Conservation Clubs, the Grand Traverse Area Sport Fishermen's Association, and the Michigan Charter Boat Association. The Court reserved decision on these motions and allowed petitioners to participate in the proceedings as litigating *amici curiae.*

In the fall of 1984 the Court appointed Special Master Francis E. McGovern for the dual purposes of supervising pre-trial matters and attempting to facilitate a settlement among the parties and litigating *amici.* Trial on the allocation motion was set for April 22, 1985.

Following extensive negotiations, culminating in a several day marathon session in Sault Ste. Marie, an Agreement for Entry of Consent Order was signed on March 28, 1985, by representatives and attorneys for the parties and all litigating *amici* except the Ruleau Petitioners who opted not to participate in the negotiations.

Soon after the Agreement was signed, it was rejected by one of the Tribes in a referendum. The Tribe renewed its allocation motion. Trial was held over Memorial Day weekend in 1985. The Ruleau Petitioners chose not to participate in the trial. At the close of trial, May 31, 1985, the Court entered its Order adopting, in its entirety, the Allocation Plan embodied in the Agreement for Entry of Consent Order, such Allocation Plan to be in effect for a period of fifteen (15) years.

The Agreement closed large areas of treaty-ceded waters to state-licensed commercial fishers. Because the available state waters and fishery were unable to absorb the state licensees who could no longer fish in their traditional areas, many state licensees were essentially put out of business, pursuant to the Court's Order of May 31, 1985. The licensees were allowed to retain their licenses but pursuant to this Court's order, were not allowed to harvest any fish. Those licensees, eventually numbering 27, filed this action on September 4, 1987. Plaintiffs' First Amended Complaint ("the Complaint") alleges a taking without due process in violation of the United States and Michigan constitutions and 42 U.S.C. § 1983, violation of rights of equal protection, breach of two different contracts, and violation of the Elliott–Larsen Civil Rights Act, M.C.L. § 37.2101 *et seq.;* M.S.A. § 3.548(101) *et seq.*

Settlements have been reached with seventeen (17) of the plaintiffs, leaving ten (10) plaintiffs in this action.

Defendants, the Michigan Department of Natural Resources and David F. Hales, its Director, have moved for summary judgment pursuant to Fed.R.Civ.P. 56(c). They request that this Court grant summary judgment for defendants on plaintiffs' claims of: (a) due process violation; (b)

equal protection violations; (c) taking of property without just compensation; and (d) breach of contract. The defendants have also filed a motion for partial dismissal pursuant to Fed.R.Civ.P. 12(b)(6) in which they request that this Court: (1) dismiss plaintiffs' claims under 42 U.S.C. § 1983; (2) dismiss plaintiffs' claims under the Elliott–Larsen Civil Rights Act and Count IV of the complaint; and (3) grant defendants' fees and costs reasonably incurred in defending this action. The Court is granting both defendants' motions in their entirety except for costs, which results in a complete dismissal of this action.

Each of the defendants' requests will be considered below.

### Standard
Summary Judgment

In considering a motion for summary judgment, the narrow questions presented to this Court are whether there is "no genuine issue as to any material fact and [whether] the moving party is entitled to judgment as a matter of law." F.R.Civ. Proc. 56(c). The Court cannot try issues of fact on a Rule 56 motion, but is empowered to determine only whether there are issues to be tried. *In re Atlas Concrete Pipe, Inc.*, 668 F.2d 905, 908 (6th Cir.1982).

The moving party has a right to summary judgment where that party is able to demonstrate, prior to trial, that the claims of the plaintiff have no factual basis. *Celotex Corporation v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). As the Supreme Court held in *Celotex*, "... the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. at 2552. Moreover, the Court must read the allegations of the complaint in the light most favorable to the non-moving party. *Windsor v. The Tennessean*, 719 F.2d 155, 158 (6th Cir.1983). Where, as here, the moving party has supported its motion with documents, the non-moving party may not rest on the mere allegations or denials of the pleadings, but must set forth "specific facts showing that there is a genuine issue for trial." F.R.Civ.Proc. 56(e); *Davis v. Robbs*, 794 F.2d 1129, 1130 (6th Cir.1986).

The standard for granting a motion for summary judgment is essentially the same as that for granting a motion for a directed verdict. "The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict...." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party is not entitled to summary judgment where there is sufficient evidence to allow a reasonable jury to return a verdict for the non-moving party. *Id.* at 248, 106 S.Ct. at 2510. "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255, 106 S.Ct. at 2513. With this standard in mind, the Court will review the arguments presented by both parties.

### I. Defendants' Motion for Summary Judgment

*Breach of Contract.* The defendants' first argument is directed toward the plaintiffs' breach of contract claims. There is no dispute that the alleged contracts, if any, were formed in Michigan. Therefore, Michigan law applies to this federal action. *Wells v. 10–x Manufacturing*, 609 F.2d 248, 253 (6th Cir.1979). Under Michigan law, the essential elements of a contract are (a) proper parties competent to contract, (b) proper subject matter, (c) legal consideration. (d) mutuality of agreement, and (e) mutuality of obligation. *Johnson v. Douglas*, 281 Mich. 247, 274 N.W. 780 (1937).

Plaintiffs argue that all the essential elements of a contract were met twice during the time frame contemplated under the complaint and that defendants entered into two contracts to pay compensation to the plaintiffs, both of which have been breached. A thorough understanding of the facts

surrounding this claim is necessary in order to consider it fairly.

 Following the signing of the agreement for Entry of the Consent Decree in *United States v. Michigan,* the State closed certain areas of Lake Superior and Lake Huron to state-licensed fishers and reduced the allowable catch of other licensees in northern Lake Michigan by 25 percent. These actions were confirmed by the State following entry of the Court's Order of May 31, 1985. The State, maintaining that it was willing, but not required, to compensate the plaintiffs, sought legislative funding for interim compensation for the plaintiffs. Following legislative appropriation of funds, serious negotiations between the parties began in September 1985. Pursuant to various legislative appropriations, several payments of interim compensation were made to plaintiffs in 1985 and 1986. Each payment was made only after receipt by the DNR of an acknowledgement from each licensee that payment of the interim compensation "impose[d] no obligation for future payments by the State of Michigan."

On January 6 and 7, 1986, the DNR presented the fishers with a compensation proposal for final compensation for all displaced Lake Michigan licensees. The plaintiffs construe this "proposal" as a offer to enter into a contract. They claim that they accepted the "offer" on January 12, 1986 and communicated this acceptance to Dr. Skoog (then Director of the DNR) on January 13, 1986 and again on January 30, 1986.

The plaintiffs present no evidence of how this "offer" was accepted. The only exhibit given to the Court is a copy of the supposed "offer" which is entitled "Summary of Compensation Proposal for Lake Michigan (WFM–02–03 and 04)." This one sheet document lists seventeen license numbers with the owners' names, compensable catch amounts and compensation proposed.

Despite plaintiffs' bold assertions to the contrary, it is impossible, on the information provided, to construe these facts as forming a binding contract agreement. The essential elements of a contract are simply not present. As the defendants point out, the DNR is, by statute, without authority to establish a new program or to expand a current program without prior appropriation. Mich.Comp.L. 18.1381. (A state agency shall not establish a new program or expand a current program ... above the level approved in the enacted budget. Proposals ... shall be ... submitted by a state agency to the state budget director for recommendation to the legislature.) The agents of the DNR have testified that they were aware that they lacked the authority to, and had no intention of, entering into a contract. Therefore, element (a) proper parties competent to contract, is missing. Additionally, element (d) mutuality of agreements, and (e) mutuality of obligation are also missing as evidenced by the fact that the document itself is titled a "proposal" and contains "proposed compensation." To call this, under the facts presented, an enforceable contract, is to stretch the definition of the word contract beyond recognition.

 Plaintiffs claim that a later second contract was formed. By the end of December 1985 it was apparent to the DNR that the Tribes were going to invoke paragraph 15 of the Consent Decree and ask the DNR to eliminate state-licensed commercial whitefish harvest in northern Lake Michigan. Subsequent to the January 6, 1986 proposal, these northern Lake Michigan licensees were grouped with the Lake Superior and Lake Huron licensees, forming a new larger group, and further negotiations ensued. On March 5, 1986, the negotiators arrived at what has been termed a "mutually acceptable package." Plaintiffs' Brief at 10; Defendants' Brief at 11. This is the second alleged contract relied on by the plaintiffs.[1] The plaintiffs claim that

---

**1.** The Court notes that plaintiffs claim that defendants raised the requirement of an outside appraisal of the worth of the licenses at issue before compensation could be disbursed for the first time on April 9, 1986. Defendants contend

that an outside appraisal requirement has been in place since the Consent Agreement was first signed in 1985 and that plaintiffs have known about such a requirement since at least February 19, 1986. Finding this issue to be of little

this compensation package called for "an immediate" payment of $8,638,655.00, which was agreed upon by all parties and that the plaintiffs expected payment under the same.

Again, it is impossible to construe this document as a legally binding contract. The document submitted, three pages long, indicates on its face that it is a memo to the Deputy Director of the DNR, indicating the figures which were arrived at by the negotiators. More than once the document makes clear that it contains *proposed* adjustments and *proposed* figures. Plaintiffs fail to allege how acceptance of the alleged "offer" took place, or to assert facts which support a finding of the existence of many of the other essential elements of a contract. I cannot find, on the facts as presented, that any contract to pay compensation to the plaintiffs in this action existed.

■ *Estoppel.* Plaintiffs claim that defendants should be estopped from denying the existence of any "contracts" under the theory of equitable estoppel. In *Conel Development, Inc. v. River Rouge Savings Bank,* 84 Mich.App. 415, 422–23, 269 N.W.2d 621 (1978), the Michigan Court of Appeals provided the following analysis of estoppel:

> Estoppel arises where (1) a party, by representations, admissions or silence, intentionally or negligently induces another party to believe facts, (2) the other party justifiably relies and acts on this belief, and (3) the other party will be prejudiced if the first party is permitted to deny the existence of the facts.

In addition, estoppel is applicable against the state in very limited circumstances. *Sittler v. Board of Control of the Michigan College of Mining and Technology,* 333 Mich. 681, 687–688, 53 N.W.2d 681 (1952). In *Sittler,* the court noted:

> The powers of State officers being fixed by law, all persons dealing with such offices are charged with knowledge to the extent of their authority or power to

bind the State, and are bound, at their peril, to ascertain whether the contemplated contract is within the power conferred.

In the instant case, the DNR is not authorized to enter into contracts without legislative appropriation. Furthermore, it is impossible to find on the facts presented that the defendants "... by representations, admissions or silence, intentionally or negligently, induced the plaintiffs to believe they (the DNR) were entering into a contract." Accordingly, estoppel will not lie in this action.

■ *Equal Protection.* Count V of the plaintiffs' amended complaint states that the plaintiffs' loss of the "right" to fish commercially, pursuant to this Court's order, constituted a violation of equal protection under the Fourteenth Amendment, section 1, and Article 1, section 2 of the Michigan Constitution. Count VII of plaintiffs' complaint also alleges equal protection violations. The equal protection clause of the Michigan Constitution affords its residents the same rights as the federal equal protection clause. *Oliver v. Kalamazoo Board of Education,* 368 F.Supp. 143 (W.D.Mich. 1973). Plaintiffs do not challenge any state legislation as such, but rather challenge defendants' enforcement of this Court's order of May 31, 1985 in *United States v. Michigan.* To the extent that the amended complaint can be read as challenging defendants' application of state law, it is recognized that the protection of the equal protection clause applies not only to the enactment of fair and impartial legislation; it also applies to the application of legislation. *Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886).

In their brief in opposition to defendants' motion for summary judgment, the plaintiffs argue that the State of Michigan has deprived non-American Indian Caucasians of their equal protection rights under the laws of the State of Michigan and of the United States of America. They claim that "the State's actions of entering into a con-

---

importance to the question of the existence of a contract, the Court merely notes the issue, but

does not deal with it.

sent agreement that favors American Indians and deprives non-Indian Caucasian individuals of their equal right to fish in the waters off the coast of the State of Michigan, as well as the State's enforcement of the same discriminatorily denies the non-Indian Caucasian fisherman of their fundamental rights and the equal protection of laws based upon national origin and race."

Plaintiffs cite a number of cases for the proposition that individuals within the same state cannot be treated differently with regards to fishing rights because of their national origin or race. *See Takahashi v. Fish & Game Commission*, 334 U.S. 410, 68 S.Ct. 1138, 92 L.Ed. 1478 (1948); *Begay v. Sawtelle*, 53 Ariz. 304, 88 P.2d 999 (1939); *Bruce v. Director, Department of Chesapeake Bay Affairs*, 261 Md. 585, 276 A.2d 200 (1971). However, none of these cases deals with the situation at hand, which is the recognition of the *superior* rights of American Indians to fish certain waters. This is where plaintiffs' claim differs from any of the cited cases, and is the crucial point of this whole matter. In their brief, plaintiffs claim that state enforcement of the consent agreement deprives them of their "equal right" to fish. However, as distasteful as it may seem to plaintiffs, they do not possess an "equal right" to fish in the waters of the coast of the State of Michigan. Judge Fox ruled, and the Sixth Circuit upheld, that the tribal fishers have an aboriginal, *superior* right to fish in certain waters. The State of Michigan has not denied the plaintiffs' equal rights by entering into and enforcing the consent agreement; it is merely enforcing the rights of the tribal fishers, which as recognized and ordered by Judge Fox in *U.S. v. Michigan*, 471 F.Supp. 192, are superior to those of non-Indian fishers. Accordingly, I will grant defendants' motion for summary judgment on plaintiffs' equal protection claims.

■ *Taking of Property Without Just Compensation.* Count VIII of plaintiffs' amended complaint alleges a taking of property rights by the government without just compensation in violation of the Fifth and Fourteenth Amendments of the United States Constitution and Article X, Section 2 of the Michigan Constitution. Plaintiffs argue that they had a property right to harvest fish commercially, as guaranteed by their commercial fishing licenses and Michigan statutes which give the right to yearly renewals of those fishing licenses. Mich.Comp.L. 308.1(b). Plaintiffs argue that a license and the renewal of a license are property interests. They cite to cases which allegedly support their proposition. *See Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); (Liberty and property rights includes the right to engage in any of the common occupations of life); *Bundo v. Walled Lake*, 395 Mich. 679, 238 N.W.2d 154 (1976) (A liquor license and the right to renew the license are property interests; the mere fact that an interest exists by the grace of the government no longer precludes the interest from being treated as a property right); *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) (Fact that must seek renewal of license on a yearly basis does not abrogate property right).

Defendants argue that to the extent that plaintiffs have a property right in their license, *per se*, plaintiffs have not lost their licenses, because defendants have allowed the plaintiffs to renew their licenses each year since 1985. While this may be literally true, plaintiffs do have the right to renew and may still possess their licenses, the Court will not deny that those licenses were rendered meaningless by issuing zero quota letters in 1985 and 1986.

Defendants also argue, much more persuasively, that license or no, defendants have not taken property away from the plaintiffs because the Court in *United States v. Michigan* ruled that the plaintiffs had no property right to harvest fish in certain waters off the State of Michigan. In *United States v. Michigan*, 653 F.2d 277 (6th Cir.1981), the Court held that the tribal fishers held a right to take fish commercially which was superior to the rights of Michigan and its citizens. In protection of this superior right, the Court adopted an allocation plan which closed certain areas of the treaty-ceded waters to state-licensed

commercial fishing. Since plaintiffs, as state citizens, did not have the right to fish in the subject waters, the state could not have taken that right, with or without just compensation. Essentially, the state could not take what this Court has already ruled defendants did not have. The fact that plaintiffs did fish in the subject waters for many years does not change the fact that the tribal fishers have a superior right to the fish in those waters. Rather, it is a testament to the length of time the tribal fishers had their superior right violated by the non-Indian commercial fishers. Plaintiffs had no legal property right in their commercial fishing licenses in these circumstances; thus, defendants did not violate the property rights of plaintiffs, when it reduced those licenses. Accordingly, defendants' motion for summary judgment on plaintiffs' claims of unjust taking of property without just compensation will be granted.

*Due Process of Law.* Counts II and VII of the plaintiffs' amended complaint alleges due process violations of the Fourteenth Amendment of the United States Constitution. Plaintiffs base their claim on lack of hearings prior to reduction or elimination of plaintiffs' alleged "right" to fish commercially.

It is unnecessary to discuss the arguments provided by plaintiffs in support of this claim, as an underlying premise in this claim is that plaintiffs possessed a property or liberty interest in their fishing licenses. As discussed above, the Court, in the circumstances of this case, does not find such a property or liberty interest ever existed. Accordingly, no due process protections were required and defendants did not deny plaintiffs any due process of law when they entered into the consent agreement. Accordingly, defendants' motion for summary judgment on plaintiffs' due process claims is granted.

## II. *Defendants' Motion for Partial Dismissal*

In addition to the motion for summary judgment considered above, the defendants have moved for partial dismissal on the remaining counts of plaintiffs' complaint pursuant to Fed.R.Civ.P. 12(b)(c). The various parts of defendants' motion will be considered separately below.

### *Standard*

■■■ In reviewing the dismissal of a complaint under Fed.R.Civ.P. 12(b)(6), the court must construe the complaint liberally in plaintiffs' favor and accept as true all factual allegations and permissible inferences therein. *Kent v. Johnson,* 821 F.2d 1220, 1223 (6th Cir.1987); *Westlake v. Lucas,* 537 F.2d 857, 858 (6th Cir.1976). The court must determine whether plaintiffs' complaint sets forth sufficient allegations to establish a claim for relief. Dismissals of complaints filed under the civil rights statutes are scrutinized with special care. *Kent,* 821 F.2d at 1223; *Brooks v. Seiter,* 779 F.2d 1177, 1180 (6th Cir.1985). The court's task on a 12(b)(6) motion is necessarily a limited one. The issue is not whether plaintiffs will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims. *Scheur v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). The complaint must in essence set forth enough information to outline the elements of a claim or to permit inferences to be drawn that these elements exist. *Jenkins v. McKeithan,* 395 U.S. 411, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969); *German v. Killeen,* 495 F.Supp. 822, 827 (E.D.Mich.1980). Conclusory allegations are not acceptable, however, where no facts are alleged to support the conclusion or where the allegations are contradicted by the facts themselves. *Vermillion Foam Products Co. v. General Electric Co.,* 386 F.Supp. 255 (E.D.Mich.1974). The court cannot dismiss plaintiffs' complaint unless "it appears beyond doubt that the plaintiffs can prove no set of facts in support of its claim which would entitle it to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). With this standard in mind, the Court will review the pleadings filed by both parties.

*Discussion*

Plaintiffs' first amended complaint alleges in Counts II and VII that defendants violated 42 U.S.C. § 1983. 42 U.S.C. § 1983 states in relevant part:

> Every person who, under color of any statute ... of any State, subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in any action at law, suit in equity, or other property proceeding for redress.

Section 1983 applies to "persons" only. "Persons" as used in the statute does not include the state or its agencies. *Will v. Michigan Dept. of State Police,* — U.S. —, —, 109 S.Ct. 2304, 2312–13, 105 L.Ed.2d 45, 59 (1989). Plaintiffs, in their response to defendants' motion for partial dismissal, concede that the Michigan Department of Natural Resources is a state agency, and as such is not included in § 1983. Therefore, defendants' motion to dismiss plaintiffs' § 1983 claims against the Michigan Department of Natural Resources is granted.

Defendants also argue that plaintiffs' § 1983 claim against defendant Hales is similarly subject to dismissal. A suit against a state official acting outside of his or her "official capacity" is a suit against the person, and not against the state. *See Will v. Michigan Dept. of State Police,* — U.S. —, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). However, when a state officer acts "without any authority whatsoever" a suit against him or her is not against the state. *Pennhurst State School & Hospital v. Halderson,* 465 U.S. 89, 101 n. 11, 104 S.Ct. 900, 908 n. 11, 79 L.Ed.2d 67 (1984), citing *Florida Department of State v. Treasure Salvors, Inc.,* 458 U.S. 670, 697, 102 S.Ct. 3304, 3321, 73 L.Ed.2d 1057 (1982). Plaintiffs assert that Mr. Hales acted outside of his official capacity as Director of the DNR because his actions "violated defendant's (sic) due process and equal protection rights." Defendants, of course, assert that Mr. Hales was acting in his official capacity. In addition, a suit seeking prospective injunctive relief against a state official does not amount to a suit against the state. *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). Although in their amended complaint, plaintiffs requested they be awarded damages and costs, they now assert, in their response to defendants' motion for dismissal, that what they seek is an injunctive order preventing Mr. Hales from enforcing the state licensing scheme. Because, as discussed above, plaintiffs' constitutional rights were not violated by the actions of the DNR, I need not reach the question of whether Mr. Hales in his official capacity is a 'person' under § 1983 or decide what form of relief plaintiffs are requesting. No "deprivation of rights ... secured by the Constitution" took place, and thus no § 1983 violation occurred. Accordingly, plaintiffs can prove no set of facts in support of their § 1983 claim, and defendants' motion to dismiss plaintiffs' 1983 claims against defendant Hales is granted.

*Elliott–Larsen Civil Rights Act.* Plaintiffs' sole remaining claim alleges that defendants violated the Elliott–Larsen Civil Rights Act. Mich.Comp.L. § 37.2101 et seq. Section 37.2102(1) states, in relevant part:

> The opportunity to obtain employment, housing and other real estate, and the full and equal utilization of public accommodations, public service, and educational facilities without discrimination because of religion, race, color, national origin, age, sex, height, weight, or marital status as prohibited by this act is recognized and declared to be a civil right.

Defendants correctly point out that the plaintiffs' complaint fails to specify the basis of the alleged discrimination. The complaint itself fails to allege any discrimination based on religion, race, color, national origin, age, sex, height, weight or marital status. Nor does the complaint itself allege discrimination in the provision of housing, employment, utilization of public accommodations, public service or education. The standard for pleading civil rights claims is stringent and plaintiffs must state the conduct violating their civil rights,

when and where the conduct occurred, and who was responsible. *See e.g., Scott v. Rieht*, 690 F.Supp. 368 (E.D.Pa.1988). Plaintiffs have not alleged any facts to support their legal conclusion that their civil rights have been violated under Elliott–Larsen. Accordingly, defendants' motion to dismiss plaintiffs' Elliott–Larsen claims is granted.

I note, however, that in their response to defendants' motion for partial dismissal, plaintiffs assert that their Elliott–Larsen claim is that they were deprived of fishing rights, constituting a deprivation of employment, because they are Caucasian as opposed to American Indian. They assert that the DNR "denied their commercial fishing rights" because they are Caucasian. Brief at 4. However, even if I were to look beyond plaintiffs' complaint, plaintiffs' claims would still fail for the same reason their other claims have failed; defendants did not deny the plaintiffs' "rights." Defendants did not deprive the plaintiffs of the "opportunity to obtain employment." Plaintiffs' commercial fishing "rights" were reclaimed by the tribal fishers, whose rights were superior to those of plaintiffs.

Defendants pray for costs associated with this action. They provide no authority for their request. Thus, no cause having been shown, defendants' request for costs is denied. Each party shall bear their own costs associated with this action.

In sum then, defendants' motion for summary judgment on plaintiffs' claims of due process violations, equal protection violations, taking of property without just compensation and breach of contract is granted. Further, defendants' motion for partial dismissal of plaintiffs' 1983 action for failure to state a claim, and violations of the Elliott–Larsen Civil Rights Act is granted. Defendants' request for costs is denied.